## United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | CASE NO. | 09-B-09835 |
|---|---|---|---|
| DATE | December 2, 2010 | ADVERSARY NO. | 10-A-00187 |
| CASE TITLE | Scott B. Alley, Debtor<br><br>Charles J. Myler, Trustee, Plaintiff<br><br>v.<br><br>Elis Giannini, Defendant. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, judgment in the amount of $600 in damages and $571.25 in attorneys' fees is granted against Elis Giannini and in favor of the Trustee. Mr. Giannini's request for the payment of Chapter 7 administrative expense is DENIED.

■[ For further details see text below.]

The Trustee has filed an adversary complaint against the landlord of the building where the Debtor operated a retail furniture store, Elis Giannini, alleging that he damaged inventory that the Debtor had left there and also seeking sanctions against the landlord for refusing to allow the Trustee access to the inventory. The landlord, in turn, has filed a request that the Court authorize payment of rent to him as an administrative expense for the time that the inventory was stored on his property post-petition. The Court held an evidentiary

hearing on both matters on November 5, 2010, and sets forth the following findings of fact and conclusions of law.

### A.   Factual Background

Prior to filing bankruptcy, the Debtor, Scott Alley, owned and operated a log furniture store and rustic art gallery, named Nature's Gallery, in Geneva, Illinois. The store mostly sold handcrafted aspen log furniture but also sold rustic art. Mr. Alley purchased his log furniture from Colorado, which was handmade and which he specially ordered to his own specifications. He personally transported the furniture to the store, driving back and forth from Colorado. The store had an ordinary door, so at least some of the furniture, such as bunk beds, had to be disassembled and reassembled to be moved into or out of the store.

His store was located on property that he rented from Elis Giannini, and his store was at that location for ten years. His rent was $2,450 per month, though Mr. Giannini gave him a discount for three months in the fall of 2008: instead charging $5,000 for that three-month period. Mr. Alley's clientele were mostly wealthy, and he characterized the furniture as 'high-end.' Often his customers were buying furniture for second houses. Because of this, his business suffered with the recent crash in the housing and construction market, and he ultimately closed the business in March 2009. He originally wanted to close in December 2008, but Mr. Giannini was out of the country at that time. Mr. Giannini has a winter home in Argentina, and convinced Mr. Alley to stay at the location until he returned to the U.S. in March. To persuade Mr. Alley to stay, Mr. Giannini agreed to a reduced rent of $5,000 for the three-month period of January through March, which Mr. Alley paid.

Mr. Alley vacated the building on March 15, 2009. He spoke with Mr. Giannini before he left the building, and mentioned that he was leaving some furniture and other inventory behind temporarily. When Mr. Alley left, he moved the inventory to the back of the space, but knew he was going to file for bankruptcy, and "assumed that the Bankruptcy Court would take care of [the inventory since] [t]here's no way I could move it." Tr. 28: 3-15. Mr. Giannini rented the space to a bicycle shop beginning April 7, 2009, for $2,400 per month. The new tenants agreed to work around the inventory until May 1, but wanted it out by then because they planned to open for business May 1st. At some point before May 1st, the inventory had not been removed and the new tenant wanted it moved out. Mr. Giannini had a bad arm and a bad leg, so some of the employees for the new tenant agreed to disassemble and move the inventory. Mr. Giannini gave the bicycle shop a discount on the first month's rent because they had to work around the inventory, and gave them a discount of between $500 and $1,000 on the second month's rent because they had disassembled and moved the furniture for him. They moved the majority of the inventory to the downstairs boiler room, and the remainder was moved to Mr. Giannini's garage down the street and his upstairs loft area. Unfortunately, the bicycle shop employees also threw away at least some of the artwork in the dumpster without Mr. Giannini's knowledge.

The parties dispute the value of the inventory both as of the petition date and as of today's date. The pieces of furniture were handmade by individuals who cut their own wood, and were made to Mr. Alley's specifications. Mr. Alley testified that he took stock of the furniture when he vacated the premises a few days before filing his petition, and valued it at $41,900. This was what he considered to be the 'retail' value, and he arrived at it by doubling his own purchase cost plus his cost in transporting the items from Colorado. However,

when he filed his bankruptcy petition, he listed the total value of the inventory as $25,000 in his schedules. He argued that the forty-thousand dollar figure was more accurate, since he came up with it while looking at the actual inventory, whereas the twenty-five thousand dollar figure in the schedules was "just a guess." However, Mr. Alley also testified that, towards the end of his business, he put the furniture on sale for 60% off retail, and then 80% off, and was still unable to sell the inventory that remained when he vacated the building. Tr. 27:1-4.

Mr. Alley filed his bankruptcy petition on March 23, 2009. The Trustee reviewed the file, contacted Mr. Alley around April 2nd, and learned of the furniture, which he believed was still in the rental space. The Trustee attempted to reach Mr. Giannini by phone to ask him about the furniture inventory. He called Mr. Giannini numerous times, but could only reach his son. Finally, in mid- to late- April, the Trustee was able to get in contact with Mr. Giannini by phone. The Trustee explained that he was the bankruptcy trustee for Mr. Alley's estate, that he had a duty to sell and liquidate the inventory, and that Mr. Giannini would be entitled to an administrative expense claim for the actual rental of the space until the inventory could be sold. However, Mr. Giannini refused to grant the Trustee access to the inventory and demanded payment of rent before he would provide access. Tr. 37:11-13. Mr. Giannini also stated that the inventory had been moved to three different locations, but would not disclose where the locations were. Tr. 39:20-22. The Trustee filed a motion for rule to show cause and holding of contempt against Mr. Giannini on May 5, 2009, with a hearing set for May 14, 2009. Sometime before May 14th, Mr. Giannini spoke with an attorney named Michael Dimand, and learned that he had no right to deny access to the Trustee. Mr. Dimand called the Trustee on Mr. Giannini's behalf sometime before the 14th, and explained that Mr. Giannini had realized that he was in the wrong and would cooperate fully with the Trustee. Based on that discussion, and the representation that Mr. Giannini would cooperate, the Trustee agreed to withdraw the motion for contempt. Thereafter, Mr. Giannini provided full access to the furniture.

Mr. Alley viewed the inventory sometime in late May with a potential bidder from Highland Furniture. He noticed that the furniture had been moved and mostly disassembled, and that the artwork had been thrown in the dumpster and was broken and no longer salable. Mr. Alley testified that the inventory was in perfect condition when he vacated the building, but could not determine whether it had been damaged by being moved. He stated that when he saw it in May, he could not tell for sure its condition because it was disassembled and stacked, but other than the missing artwork, testified that "it appeared to be alright." Tr. 16:4-5. The representative from Highland Furniture indicated that the furniture "was not in a condition where they could make a bid," Tr. 43:22-24, but the testimony indicated that the reason for the low bid was more because they could not properly evaluate the furniture than that it had a low inherent value. When pressed by the Trustee, Highland made an offer for around $1,500 for all of the furniture, which the Trustee rejected. The Trustee testified that the representative from Highland had stated that the furniture was "torn apart. Part of it, they couldn't even see. They had to climb up, it was like in an attic or a cellar." Tr. 43:10-13. He further testified that Highland asked "how are we going to get it out of there? How can we get to three different places? We're not interested in it." Tr. 55:14-16. In other words, there was no indication as to what they might have offered if the furniture had been reassembled and consolidated in such a way that Highland could have properly evaluated it.

                              Document      Page 4 of 9

In September 2009, Mr. Giannini had Mr. Dimand call the Trustee to warn him that the current storage areas were not weather-tight or safe for storage in the winter. The boiler room could get up to 120 degrees in the winter and became full of soot when the furnace was running, and the garage tended to flood in the winter. At least some of the inventory was damaged during the winter of 2009. One item of inventory that was permanently destroyed was an eight-foot tall teddy bear. Mr. Alley had purchased the bear for $2,500, and therefore gave it a retail value of $5,000. The teddy bear got moved to Mr. Giannini's garage, and during the winter of 2009, it got waterlogged and infested with mice, and had to be thrown away.

Other than the artwork and the teddy bear, the inventory has remained in the boiler room and the garage areas. It was somewhat implied from Mr. Giannini's warning to the Trustee that the furniture might become damaged in the winter, but other than the testimony about the teddy bear, there was no testimony about how any furniture was actually damaged after it was initially moved. In addition to the visit in May 2009, Mr. Alley viewed the inventory again at some later date with the attorney for the Trustee, Mr. Larsen, though it was unclear when this was, or if it was before or after the winter of 2009. Mr. Alley testified that it "looked pretty much the same" on the second visit as it had the first time in May 2009. Tr. 17:12-13. Although Mr. Alley testified that the remaining furniture would be difficult to sell in its current condition, and was therefore "valueless," he more specifically stated that "considering ... the way it's piled up and distributed, I don't think that there's any way you could sell it under those circumstances." Tr. 17:19-22. It is notable that he did not testify that it was damaged or that it could not be sold if it were consolidated in a showroom and reassembled. Mr. Alley also testified that, while the furniture market has currently been hit hard because of the real estate market, he felt in the long run "there was still a market for this type of furniture." Tr. 19:12-18.

**B.    Discussion**

**1. Request for Administrative Expenses.**

Mr. Giannini seeks $3,570 in rent for the use of his storage areas through July 31, 2010, plus an additional $210 per month for every month thereafter during which the inventory remains on his property as an administrative expense of the estate under Section 503(b). Mr. Giannini admitted that he did not typically rent out the storage areas and admitted that his estimate of $210 per month was somewhat "arbitrary," but thought that he "should be compensated somehow" for the use of the boiler room and garage. Tr. 89:4.

Section 507(a)(1) of the Bankruptcy Code grants first priority in the distribution of the assets of a bankruptcy estate to administrative expenses allowed under 11 U.S.C. § 503(b). In re Nat'l Steel Corp., 316 B.R. 287, 299 (Bankr. N.D. Ill. 2004) (citing 11 U.S.C. § 507(a)(1)). Administrative expense claims are governed by section 503(b) of the Bankruptcy Code, which provides, in pertinent part, "(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including--(1)(A) the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A). To be entitled to priority, the claim must arise from a transaction with the Trustee post-petition which was beneficial to the estate. In re Jartran, Inc., 732 F.2d 584, 587 (7th Cir. 1984) ("[A] claim will be afforded priority under § 503 if the debt both (1) 'arise[s] from a transaction with the debtor-in-possession' and (2) is 'beneficial to the debtor-in-possession in the operation of the business.'") (quoting In re Mammoth Mart,

Inc., 536 F.2d 950, 954 (1st Cir. 1976)). The moving party bears the burden of proving that its claim is entitled to administrative expense priority and the standard of proof is a preponderance of the evidence. In re Nat'l Steel Corp., 316 B.R. at 300 (citations omitted).

To qualify as actual and necessary expenses, expenditures must benefit the estate as a whole. Id. (citing In re Jartran, Inc., 886 F.2d 859, 871 (7th Cir.1989)). Accordingly, claims pursuant to section 503(b)(1)(A) shall be measured by the benefit received by the estate, rather than the costs incurred by a claimant. Id. (citing DeMert & Dougherty, 227 B.R. 508, 513 (Bankr. N.D. Ill. 1998)). Thus, the focus for purposes of determining a benefit to the estate turns on actual benefits conferred upon the estate, not losses sustained by the creditor. Id. at 302 (citing Cargill Fin. Servs. Corp., IDS v. Envirodyne Indus., Inc., No. 94 C 6950, 1995 WL 461854, at *3 (N.D. Ill. July 12, 1995)).

The Court is sympathetic to the imposition that was placed on Mr. Giannini in storing the furniture for over a year and a half, but Mr. Giannini has not demonstrated by the preponderance of the evidence that the estate gained anything by storing the furniture in the way it was stored. At the very least, the storage during the winter months seems to have *diminished* the value, particularly with respect to the teddy bear that became infested with mice.

Even if the Court were willing to grant administrative expense priority, it would want to limit such claim to a percentage of the *actual* proceeds that the estate received from the disposition of the property. However, the furniture has still not been sold, yet, and the Court is not convinced that, after 18 months without success, a sale to *any* buyer is likely in the future. The highest bid that the Trustee has received was for $1,500, but that was over a year ago, and before the teddy bear was destroyed and the remainder of the inventory suffered through a winter of flooding or excessive heat and soot. Instead, it seems that no one wants to have anything to do with the furniture. While the furniture theoretically could have value to the right buyer, no one seems to want to risk incurring the cost or effort of preparing, moving and reassembling the furniture, when there might be missing parts, hidden damage, or no buyers in this poor market. The Debtor abandoned the inventory for the bankruptcy trustee to deal with. Mr. Giannini pushed it off into the corners of his property. The bankruptcy trustee laments the current state of the furniture, but is unwilling to incur the costs of moving the furniture to better storage areas and reassembling it, and can't find an auctioneer or other third party who would be willing to do so. Even the one potential buyer, Highland Furniture, expressed doubt about how it would get the furniture "out of there" and reassembled, even if it were interested. Mr. Giannini ended up paying as much as $1,000 to move the furniture into storage and to disassemble it. One would imagine that reassembling it and moving it long-distance would be even more expensive and more daunting a task.

Given that no one appears to be doing anything with the furniture, the Court has deep concerns as to why it has sat in storage for over a year and a half. In the context of the bailment claim, the Trustee tried to present evidence that the furniture is currently "worthless," yet the Court wonders why he didn't abandon it long ago if he truly felt so. If the costs of moving and properly preparing the furniture for sale outweigh the risk-adjusted benefits of a successful sale, it would seem of little value to the estate. However, no party has filed a motion to abandon or to compel abandonment under Section 554, and the Court will not raise such a motion sua sponte.

### 2. Bailment and Damage to the Inventory

The Trustee seeks damages against Mr. Giannini under Illinois common law on the theory that Mr. Giannini was a bailee of the inventory and is liable for damage to the property caused by his negligence during his custody. Under Illinois law, a bailment is "a consensual relationship that can be established by express contract or by implication … and the agreement of the parties to a bailment may be implied in law or in fact." Am. Ambassador Cas. Co. v. City of Chicago, 205 Ill. App. 3d 879, 882, 563 N.E.2d 882, 884 (Ill. App. Ct. 1990). "A constructive bailment, or a bailment implied in law, may be found where the property of one person is voluntarily received by another for some purpose other than that of obtaining ownership." Id. "In such cases, the law implies a contract for the keeping of the property until it shall be restored to the owner or his agent, and the … holder is bound to take care of, keep, and preserve the property, not for the sake of any benefit to himself or upon any expectation of compensation for his services, but solely for the convenience and accommodation of the owner." Id.

To recover under a bailment theory, "the plaintiff must allege: (1) an express or implied agreement to create a bailment; (2) delivery of the property in good condition; (3) the bailee's acceptance of the property; and (4) the bailee's failure to return the property or the bailee's redelivery of the property in a damaged condition." Am. Ambassador Cas. Co. v. Jackson, 295 Ill. App. 3d 485, 490, 692 N.E.2d 717, 721 (Ill. App. Ct. 1998). "When a *prima facie* case of bailment is established, there is a presumption of the defendant's negligence." Id. "The defendant must then present sufficient evidence to support a finding that the presumed fact did not exist and that the defendant was free from fault." Id.

Here, the Court finds that Mr. Giannini entered into two implied agreements creating a bailment. First, he entered into a bailment for the sole benefit of the bailor when he agreed to allow Mr. Alley to leave the inventory on the premises for a limited time. Second, the bailment became a bailment for mutual benefit or a bailment for hire when Mr. Giannini demanded rent of the Trustee and was promised a potential administrative expense claim for rent. When Mr. Alley vacated the rental space and left behind the inventory with Mr. Giannini's consent, the property was delivered into Mr. Giannini's control and was accepted by him. The Trustee has stated a *prima facie* case with respect to the teddy bear and the artwork, since these were either destroyed or never returned. However, the Trustee has failed to prove that the remainder of the inventory was redelivered in a damaged condition. The Trustee's only witness as to the condition of the furniture testified that, although it had been disassembled, the furniture, other than the artwork, "appeared to be alright." The Trustee presented no evidence that the remaining furniture could not be easily reassembled or any evidence that it had been permanently damaged.

The Court finds, however, that Mr. Giannini has rebutted the presumption of negligence with respect to the teddy bear. Mr. Giannini warned the Trustee in advance that the garage and boiler room were not safe places for storage during the winter months. The Trustee also had access to the furniture if he had so desired, and the Trustee's attorney, Mr. Larsen, had viewed the areas where the items were being stored. Yet, despite the warnings and the Trustee's knowledge of the conditions of the storage areas, the Trustee took no action. He did not take repossession of any of the inventory or ask that it be moved. In light of these circumstances, the Court cannot find that Mr. Giannini was to blame for the damage to the bear. Although it is true that Mr. Giannini

originally moved the furniture into the storage areas, and that he did so without Mr. Alley's or the Trustee's knowledge or consent, there was no suggestion that the storage areas were unsafe when he moved them in the spring, or in the summer or fall. Furthermore, at the time he moved the items, he had a reasonable expectation that the items would be sold within weeks, not months or years. By the time winter came, the original rental space had been rented to and occupied by the bicycle shop for half a year, and the furniture could not be moved back to that area. Moreover, in light of the somewhat involuntary way that Mr. Giannini became a bailee, the Court cannot fault Mr. Giannini where he alerted the Trustee of the risks well in advance. The Trustee had previously made clear to Mr. Giannini that he was not to move the inventory without the Trustee's consent, and the Trustee offered him no alternative but to leave the items where they were in the storage areas. Therefore, the Court finds that the damage to the bear was not caused by the negligence of Mr. Giannini for purposes of a bailment claim.[1]

In contrast, the Court finds that Mr. Giannini has failed to rebut the presumption of negligence with respect to the artwork. Although the artwork was thrown out by employees of the new tenant bicycle shop, not by or at the express direction of Mr. Giannini, Mr. Giannini had asked the bicycle shop employees to take care of moving and disassembling the furniture, and he provided consideration for them to do so, through the rent discount. Under Illinois law, a bailee may be liable for losses resulting from the acts or negligence of his employees or servants. See, e.g., Evans v. Williams, 232 Ill. App. 439 (Ill. App. Ct. 1924). Mr. Giannini chose to have the bicycle shop employees take care of the furniture, and did so without the knowledge or consent of either Mr. Alley or the Trustee. Furthermore, it appears that the bicycle shop employees threw out the artwork while within the scope of the duties for which he had hired them. The Trustee has therefore demonstrated that Mr. Giannini was liable for the damage to the artwork.

The final question is damages. In Illinois, the ordinary measure of damages for personal property is the fair market value at the time of the loss. Centagon, Inc. v. Bd. Of Dir. Of 1212 Lake Shore Drive Condo. Ass'n, No. 00-C-1110, 2001 WL 1491523, at *8 (N.D. Ill. Nov. 21, 2001) (citing Jankoski v. Preiser Animal Hosp., Ltd., 157 Ill. App. 3d 818, 820, 510 N.E.2d 1084, 1086 (Ill. App. Ct. 1987)). The Seventh Circuit has noted that an "asset's value depends on the price that could be agreed by willing buyers and sellers negotiating for a replacement." United Air Lines, Inc. v. Reg'l Airports Improvement Corp., 564 F.3d 873, 875 (7th Cir. 2009) (citing Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 117 S. Ct. 1879 (1997)). However, the parties did not provide evidence of any offers to purchase the artwork or list any sales of comparable property. Mr. Alley placed a retail price for the artwork of $3,000 with little to no explanation about how he came to that value.[2] In contrast, Mr. Giannini argued that the artwork must have had no value, since it could not even be sold when offered for 80% off the retail price. The artwork had already been destroyed by the time Highland Furniture viewed the inventory and made its offer, so the artwork was not included in its $1,500 offer. The Court is skeptical that Mr. Alley's retail price is an accurate estimate of the fair market value at the time the artwork was

---

[1] As noted above, the Trustee presented no evidence that any other items were damaged by the winter storage or any evidence as to the extent of any such damage.

[2] It was not entirely clear from the testimony whether he used the same 'cost times two plus transportation costs' formula to place a retail value on the artwork as he did for the log furniture.

destroyed, yet, the Court does not believe it had no value, either. With very little details to make its own determination, the Court will take the value offered by the parties that is closest to what the Court feels is the true value. The Court therefore finds that the artwork was worth $600, or 20% of Mr. Alley's 'retail' price. The Court recognizes that liquidation sales are not always an accurate indicator of 'true' market value, and that the artwork at issue did not sell even at the liquidation sale. However, the fact that Mr. Alley offered to sell the artwork for $600 indicates that, at least at the time, that was the value that he placed on it. In the absence of any other evidence, the Court finds it was worth $600 at the time it was destroyed, and will set the damages at $600.

### 3. Sanctions for Non-cooperation.

Section 542(a) of the Bankruptcy Code directs that, with limited exceptions, anyone "in possession, custody, or control" of property of the estate "shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." Therefore, even in the absence of a court order, upon the filing of Mr. Alley's bankruptcy case, Mr. Giannini had an obligation to deliver to the trustee the furniture inventory, which was in his possession and which had a value of at least $1,500. See, e.g., Thompson v. Gen. Motors Acceptance, Corp., 566 F.3d 699 (7th Cir. 2009) (noting that a "reading of 11 U.S.C. § 542(a) ... indicates that turnover of a seized asset is compulsory."); Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. v. Boyer (In re U.S.A. Diversified Prods., Inc.), 196 B.R. 801, 805 (N.D. Ind. 1996) ("There is no requirement in the Code that the trustee make demand, obtain a court order, or take any further action in order to obtain a turnover of the estate's property.") (internal citation omitted). Inherent in this obligation to "deliver" property of the estate is at minimum an obligation to provide the trustee reasonable access to the property so that he or she can determine whether it has value to the estate and how it can or should be delivered to or otherwise administered by the trustee. In this case, when the Trustee called Mr. Giannini, Mr. Giannini flatly refused to allow him access to the furniture or to even disclose where it had been moved to unless the Trustee first paid him money. Mr. Giannini was aware of Mr. Alley's bankruptcy, and knew that the furniture was undisputedly the property of Mr. Alley or his bankruptcy estate, and yet willfully refused to provide access. He has offered no justification other than his mistake of law, and has subsequently admitted that his initial refusal and noncompliance was not warranted and "was wrong." Tr. 87:24-25.

Other courts have held that where a debtor's landlord refuses to grant a trustee access to property of the estate, a bankruptcy court has the power to grant sanctions against the landlord, including the "authority for a bankruptcy court to make an award of attorneys' fees and costs in appropriate circumstances." In re Ambotiene, 316 B.R. 25, 36 (Bankr. E.D.N.Y. 2004) (finding authority under the court's equitable powers under Section 105(a) of the Bankruptcy Code), aff'd Grand Street Realty, LLC v. McCord, No 04-CV-4738, 2005 WL 2436214 (E.D.N.Y. Sept. 30, 2005)). The court in Ambotiene considered four factors in determining whether to grant such sanctions: "first, whether the Chapter 7 trustee acted in good faith to pursue his statutory duties and obligations under the Bankruptcy Code; second, whether the response by the objecting party was made in objective good faith; third, whether the objecting party had an opportunity to correct its course and failed to do so; and fourth, whether the Chapter 7 trustee or the debtor's estate was damaged by incurring unnecessary costs as a result of the objecting party's actions." 316 B.R. at 36. The Court finds that the trustee acted in good faith in initially requesting access to view the property, and that Mr. Giannini's initial refusal was made in bad faith, as further demonstrated by his demand for immediate payment.

While Mr. Giannini did quickly correct his course after speaking with legal counsel, he did so only after the Trustee had to file a motion for contempt and incur costs in preparing such motion. Therefore, the Court is willing to award sanctions for Mr. Giannini's initial noncompliance, but only for the actual costs incurred as a result of the noncompliance. There was no dispute that, after his attorney called the Trustee shortly before the May 14th status hearing on the contempt motion, Mr. Giannini complied with the Trustee's every request. Therefore, it is inappropriate to grant the full $7,800 in attorneys' fees that the Trustee seeks, which largely arise out of the Trustee's adversary complaint against Mr. Giannini under the bailment theory. Other than in limited exceptions, U.S. courts follow the "'American Rule,' under which each party bears its own litigation costs." Ambotiene, 316 B.R. at 36 (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257-59, 95 S. Ct. 1612 (1975)). In reviewing the Trustee's itemization of attorneys' fees, the Court finds that the only items which directly resulted from Mr. Giannini's noncompliance were the 1.6 hours spent preparing the motion for contempt, the 1.0 hour telephone conference with Mr. Giannini's attorney shortly before the contempt hearing, and the 1.0 hour the Trustee's attorney spent travelling to the courthouse for the contempt hearing. The Court will additionally reduce each of the last two items from one hour to fifteen minutes. It likely took Mr. Giannini's attorney just a few minutes to explain that his client had realized he was wrong and would comply in the future. Therefore the remainder of the call was not directly related to Mr. Giannini's noncooperation. Similarly, the contempt hearing was part of the Court's regular Geneva call, and since the only thing the Trustee did was to withdraw his motion, the hearing likely took only a few minutes. Furthermore, the Trustee's attorney regularly appears on numerous different matters on the Court's Geneva call, and so it seems inappropriate to attribute the full time he spent in Geneva to this one brief matter. Therefore, the Court will grant the Trustee's actual costs of $571.25 against Mr. Giannini.

### C.    Conclusion

For the foregoing reasons, the Court grants the Trustee's actual costs of $571.25 against Mr. Giannini as sanctions for his initial willful noncompliance with the Trustee's request. The Court grants damages of $600.00 against Mr. Giannini and in favor of the Trustee for the damage to the artwork, and denies the remainder of the Adversary Complaint. The Court denies Mr. Giannini's request for administrative expenses.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

December 2, 2010

_____
Judge Manuel Barbosa